# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

FERENC FODOR,

      **Plaintiff,**

v.                                          **Case No: 5:12cv28/RS/CJK**

EASTERN SHIPBUILDING GROUP,

      **Defendant.**

_____/

## ORDER and REPORT AND RECOMMENDATION

This case, filed under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112-12117, is before the court on defendant's motion for summary judgment and evidentiary materials (docs. 137-139), defendant's motion to dismiss (doc. 102) for plaintiff's failure to comply with the court's August 30, 2013 discovery order, defendant's motion to dismiss (doc. 133) for plaintiff's failure to obey a discovery order requiring plaintiff to pay a discovery sanction, and defendant's motion for sanctions (doc. 153) for plaintiff's violation of the court's December 19, 2013 order prohibiting plaintiff from threatening defendant or defendant's counsel and from making accusations in this proceeding of criminal conduct by defendant or defendant's counsel.  Plaintiff has responded only to defendant's motion for sanctions

(doc. 153) and has not responded to defendant's motion for summary judgment or motion to dismiss for plaintiff's failure to pay the discovery sanction. (Doc. 157).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(E). Having fully considered the parties' submissions, the record and the relevant case law, the undersigned recommends that defendant's motion for summary judgment be granted, all other motions be denied, and this case be closed.

## BACKGROUND AND PROCEDURAL HISTORY

The court will briefly summarize the most relevant portions of this case's lengthy procedural history. Plaintiff initiated this action on February 8, 2012, by filing a complaint alleging employment discrimination. (Doc. 1). Plaintiff filed a second amended complaint on September 4, 2013. (Doc. 89). Plaintiff's second amended complaint alleges that plaintiff was discriminated against and harassed on the basis of his national origin and alleged disability, and that plaintiff was retaliated against for complaining about the discrimination/harassment. (*Id.*).

On August 30, 2013, the undersigned issued a discovery order compelling plaintiff to provide certain items of discovery. (Doc. 88). Defendant filed a motion to dismiss based, in part, on plaintiff's failure to comply with that discovery order. (Doc. 102). The undersigned deferred ruling on the issue pending defendant's filing of a status update. (Doc. 130). On January 2, 2014, defendant filed a notice of plaintiff's compliance. (Doc. 134). The undersigned will recommend below that defendant's motion to dismiss (doc. 102) for plaintiff's alleged non-compliance with the August 30, 2013 discovery order be denied as moot.

On October 21, 2013, the undersigned issued a discovery order granting defendant's motion to compel and for sanctions in connection with plaintiff's aborted deposition. (Doc. 113).  Upon defendant's submission of affidavits of its expenses incurred in connection with plaintiff's aborted deposition and in making its motion to compel, the undersigned issued the following order on November 27, 2013:

> 1.  Plaintiff shall pay to the defendant, Eastern Shipbuilding Group, the amount of $2,001.40, which constitutes the reasonable expenses and attorney's fees incurred by the defendant as a result of plaintiff's refusal to proceed with his August 30, 2013 deposition. Plaintiff shall pay such sum by monthly installments in the amount of $150.00 per month, payable on the 15th of each month, commencing December 15, 2013, and continuing each consecutive month thereafter, until the total amount of this $2,001.40 sanction is paid in full.

> 2.  As a separate and additional sanction, plaintiff shall pay to the defendant, Eastern Shipbuilding Group, the amount of $3,217.49, which constitutes the reasonable expenses and attorney's fees incurred by the defendant in making its September 18, 2013 motion to compel.  Plaintiff shall pay such sum by monthly installments of $150.00 per month, payable on the 15th of each month, commencing December 15, 2013, and continuing each consecutive month thereafter, until the total amount of this $3,217.49 sanction is paid in full.

> 3.  Plaintiff's failure to make timely payments in compliance with this order will result in the imposition of additional sanctions, which may include dismissal of this case.

(Doc. 124, pp. 3-4).  The District Judge affirmed the November 27, 2013 order. (Doc. 127).  Defendant's motion to dismiss filed on December 31, 2013, asserts that plaintiff has not remitted any payment as required by the court, and that plaintiff failed to respond to defendant's letter demanding payment. (Doc. 133).  Defendant requests that plaintiff's second amended complaint be dismissed with prejudice as a

sanction for plaintiff's contempt of the discovery order.  (*Id.*).  Plaintiff has not responded to defendant's motion.

On December 19, 2013, the court issued an order granting defendant's request that plaintiff be admonished or sanctioned for improper and vexatious litigation conduct, including plaintiff's threatening defendant and defendant's counsel with criminal charges and complaints to The Florida Bar and the Florida Attorney General's Office.  (Doc. 130).  The court admonished plaintiff that:  (1) any future threats or conduct against defendant (or defendant's counsel) for exercising the right to defend this proceeding would result in a minimum sanction of $250 for each instance of misconduct; and (2) plaintiff's reference in this proceeding to forgery, criminal charges, criminal conduct or anything "criminal" in nature in relation to defendant or defendant's counsel would result in a $250 sanction for each instance. (Doc. 130).  The District Judge affirmed the December 19, 2013 order.  (Doc. 140). Defendant's motion for sanctions filed on February 11, 2014, requests that plaintiff be sanctioned $250 for filing an Attorney Complaint with The Florida Bar alleging that defendant's counsel (Adrienne L. Conrad) forged documents relating to this case. (Doc. 153).   Plaintiff responds in opposition that his complaint to The Florida Bar does not violate the court's December 19, 2013 order, because:  (1) the court did not prohibit, or have jurisdiction to prohibit, plaintiff from making a complaint against defendant or its counsel to The Florida Bar, the local police, or any other agency, and (2) plaintiff is not bound by the court's admonishment, because the court lacked jurisdiction to impose it and such admonishment violates plaintiff's constitutional right of free speech.  (Doc. 157).

On January 6, 2014, defendant filed a motion for summary judgment and evidentiary materials.  (Doc. 137-39).  Plaintiff has not responded to defendant's summary judgment motion.  The court will resolve this case on defendant's motion for summary judgment.

## DISCUSSION

Summary Judgment Standard

A motion for summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of proof to set forth the basis for its motion, identifying facts as to which there is no genuine dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The failure of the nonmoving party to create a factual dispute does not itself authorize the entry of summary judgment; the moving party must establish the absence of a material dispute of fact.  *See Dixie Stevedores, Inc. v. Marinic Maritime, Ltd.*, 778 F.2d 670, 673 (11th Cir. 1985). When, however, the nonmoving party fails to properly address the moving party's assertion of fact, the court may consider the fact undisputed and may grant summary judgment if the motion and supporting materials show that the moving party is entitled to it.  Fed. R. Civ. P. 56(e)(2), (3); *see also* N.D. Fla. Loc. R. 56.1(A) (stating that facts set forth in the moving party's required statement will be deemed admitted unless controverted by the opposing party).

Facts

The facts set forth in defendant's statement of facts (doc. 138) have not been disputed, are sufficiently supported by defendant's evidentiary materials (doc. 139),

and are deemed admitted. *See* Fed. R. Civ. P. 56(e); N.D. Fla. Loc. R. 56.1(A). The relevant facts are these.[1]

Defendant Eastern Shipbuilding Group ("Eastern") is a shipbuilding and marine repair company specializing in commercial steel and aluminum vessel construction and repair. (Doc. 139, Babb Aff. ¶ 3). Eastern also engages in industrial steel fabrication. (*Id*.). Eastern has a Nelson Street shipbuilding and repair facility and an Allanton shipyard. (*Id*.). Eastern is an equal opportunity employer, and has a policy opposing any form of discrimination, including national origin and disability discrimination. (*Id*. ¶ 4 and Ex. A). Eastern's Equal Opportunity Policy also provides, in pertinent part:

> Applicants and employees are directed to bring any violation of this policy to the immediate attention of a Company supervisor, Human Resources, or the company Vice President. Any employee who violates this policy or knowingly retaliates against an employee or applicant reporting or complaining of a violation of this policy shall be subject to immediate disciplinary action, up to and including termination of employment.

(*See* Pl. Dep., Ex. 15). In addition, Eastern has a Complaint Policy which provides:

> Eastern Shipbuilding Group, Inc. is concerned with any situation affecting the employment relationship. The Company is committed to correcting any condition or situation that may cause unfairness or misunderstanding. It is inevitable that problems and misunderstandings may occur. Therefore, the company has provided an orderly manner for an employee to voice an opinion or discuss a problem with management without prejudice or fear of retaliation.

---

[1]Each factual statement contained in this Report and Recommendation is drawn from defendant's Statement of Facts (doc. 138) and supporting evidence (doc. 139), but cites only the evidentiary material (doc. 139).

> If an employee has a problem or complaint, the employee should discuss it with his or her immediate supervisor as soon as possible.
>
> If the problem still has not been satisfactorily resolved, the employee may make an appointment to discuss the situation with the Vice President of the Company for a final resolution.  The Human Resources Manager or designee may assist the employee (if requested) in the presentation of the problem to the Vice President. . . .
>
> No one may criticize you, penalize you, or treat you differently in any way for using this problem solving procedure.

(*See id.*, Ex. 16).  Finally, Eastern also has a Policy Against Harassment that provides, in pertinent part:

> Our company is committed to providing a work place free of . . . harassment based on such factors as race, creed, national origin, sex, age, disability, marital status, sexual orientation, citizenship status, ancestry, medical condition, or veteran status.  Our company strongly disapproves of and will not tolerate harassment of employees by managers, supervisors, or co-workers.  Our company will also attempt to protect employees from harassment by non-employees in the work place. . . .  You should report any incidents of harassment, including work-related harassment by any company personnel or any other person. . . .  Every complaint of harassment that is reported to a supervisor or Human Resources will be investigated thoroughly [and] promptly. . . . In addition, our company will not tolerate retaliation against any employee for making a complaint.

(*See id.*, Ex. 17).  Plaintiff ("Mr. Fodor") acknowledged receiving Eastern's handbook with the Policy Against Harassment.  (Pl. Dep. at 112-13, Ex. 18).

Over the years, depending on work load, Eastern has employed from 100 up to 1400 employees.  (Babb Aff. ¶ 5).  When a particular craft is needed at a facility, machinists and welders are regularly transferred between yards, and even between crafts depending on the need for a particular craft.  (*Id.*).  During Mr. Fodor's

Case 5:12-cv-00028-RS-CJK   Document 160   Filed 03/27/14   Page 8 of 37

*Page 8 of  37*


employement, after the oil spill tragedy in the Gulf of Mexico, several contracts were delayed and/or canceled.  (*Id*.).  As a result, employment levels dropped as the work load decreased.  (*Id*.).  Specifically, the Nelson yard, where Mr. Fodor was last assigned, went from 17 employees to 6 employees after the oil spill until the work load increased again in mid-2011.  (*Id*.).

Eastern first employed Mr. Fodor as a Welder on January 8, 2007.  (Pl. Dep. at 78: 19-24; Babb Aff. ¶ 6).  Mr. Fodor resigned on August 29, 2007, but was rehired on March 31, 2008.  (Pl. Dep. at 93: 4-10; 96: 12-15; Babb Aff. ¶ 6).  When Mr. Fodor reapplied in 2008, he stated in his Employment Application that he was applying for the positions of Welder (25 years of experience) and Mechanic (10 years of experience).[2]  In response to the question, "Are you able to perform the essential job functions for the position(s) you are applying for?," Mr. Fodor checked the box

---

[2]Mr. Fodor has not responded in opposition to Eastern's summary judgment materials and has not disputed this fact.  Throughout this proceeding, Mr. Fodor alleged repeatedly that his employment applications were "forged" or "altered" because he believed that instead of there being a single question concerning the positions for which he was applying and the years of related experience, his "true"applications contained two separate questions – one requesting the positions in which he had experience and one requesting how much experience he had in those positions.  (Doc. 139, Pl. Dep. at 79, 83).  To the extent this fact is material, an assumption the undersigned finds no basis to support, Eastern has submitted the affidavits of two employees who applied around the same time Mr. Fodor applied, in 2007 and 2008.  The employees confirm that their applications had the same questions that are found on Mr. Fodor's applications, and that there was only a single question.  (Doc. 139, Ex. 4, Curl Aff. ¶ 3; Ex. 2, Snyder Aff.  ¶ 3).  Mr. Fodor has not responded in opposition to Eastern's summary judgment evidence.

*Case No: 5:12cv28/RS/CJK*

for "Yes."[3]  (*Id*.).  Mr. Fodor admits that during his last stint with Eastern, he performed some welding duties.  (Pl. Dep. at 102-03, 189).

During Mr. Fodor's last tenure with Eastern, John Long, former Inside Machinist Superintendent (Caucasian American), was Mr. Fodor's supervisor.  (Pl. Dep. at 104: 10-13; Babb Aff. ¶ 6).  When Mr. Fodor reapplied in 2008, Mr. Long told Mr. Fodor to put in an application for the job and made the final decision to hire him.  (Pl. Dep. at 96-97; Babb Aff. ¶ 6).

On May 27, 2010, Eastern posted an opening for a Machinist Supervisor position.  (Babb Aff. ¶ 8; Serna Aff. ¶ 3).  On or about June 28, 2010, Vice President of Operations Marvin Serna (Hispanic American) put the position on hold due to a reduction in business, and determined that the Machinist Supervisor position could not be filled until business increased.  (*Id*.).[4]  Human Resources still accepted applications for the position in the hope that business would increase and the position could be filled.  (*Id*.).  Mr. Fodor applied for the Machinist Supervisor position on or about August 5, 2010, but neither he nor any other applicant could be considered for the position while it was on hold.  (*Id*.).  The Machinist Supervisor position remained on hold and was not filled even after business increased.  (*Id*.).

---

[3]Mr. Fodor has also repeatedly alleged throughout this case that he indicated on his employment applications both times he was hired that he had a disability.  (Doc. 139, Pl. Dep. at 79-80, 91).  Eastern asserts as fact, and cites competent evidence supporting such fact, that Eastern does not ask applicants about any disabilities on its employment applications or during the interview process.  (Doc. 139, Babb Aff. ¶ 7).  Eastern's supporting materials include affidavits from two employees who applied around the same time plaintiff applied, in 2007 and 2008, which confirm that there was no such question about disabilities on their application forms, Curl Aff. ¶ 4; Snyder Aff. ¶ 4, which are identical to the forms Mr. Fodor completed..  Mr. Fodor has not responded in opposition to Eastern's summary judgment materials and has not disputed this fact.

[4]Mr. Fodor admits that he does not know who made the decision to put the position on hold. (Doc. 139, Pl. Dep. at 182-83).

Prior to the time that Mr. Fodor applied for the Machinist Supervisor job, the downturn in business continued to necessitate the transfer of employees from the Nelson yard to the Allanton yard.  (Babb Aff. ¶ 9; Serna Aff. ¶ 4).  In August of 2010, Mr. Serna determined that Mr. Fodor's skills as a Welder were needed at the Allanton yard and that there was not enough work to justify keeping Mr. Fodor as a Machinist at the Nelson yard.[5]  (Babb Aff. ¶ 9, Serna Aff. ¶ 4).  As a result, on August 19, 2010, Bob Babb, Human Resources Manager (Caucasian American) informed Mr. Fodor that Eastern was transferring Mr. Fodor to the Welding Craft at the Allanton yard. (Babb Aff. ¶ 9).  Nine other employees (all Caucasian Americans) had already been transferred from the Nelson yard to the Allanton yard.  (*Id.*).

Mr. Fodor stated to Mr. Babb that he was not going to do the Welding job. (Babb Aff. ¶ 10).  After Mr. Babb reminded Mr. Fodor that he was an at-will employee and that he was not guaranteed a Machinist position or guaranteed to work only at the Nelson yard, Mr. Fodor then alleged that he could not perform the duties of a Welder because of his "disability" and that he was not going to report to work at the Allanton yard.  (Pl. Dep. at 122-23; Babb Aff. ¶ 10).  At some point (either in the same conversation or a subsequent conversation on August 20, 2010, discussed below), Mr. Fodor also inquired about the Machinist Supervisor position, and Mr. Babb informed Mr. Fodor that that position was on hold based on the business needs of Eastern.  (Pl. Dep. at 123; Babb Aff. ¶ 10).  Mr. Babb also informed Mr. Fodor that, should the position become available in the future, Mr. Fodor would be

---

[5]Mr. Fodor speculated during his deposition testimony that Joe Rodgers, a co-worker of his, helped John Long pass urine tests; and therefore, could force Mr. Long to get Mr. Fodor transferred. (Doc. 139, Pl. Dep. at 175). Mr. Fodor admitted, however, that the urine test accusation was merely based on talk amongst the employees and that his belief that Mr. Rodgers wanted him transferred was also based on inadmissible hearsay.  (*Id.* at 176-77).

considered for the job.  (Babb Aff. ¶ 10).  At the end of the conversation, Mr. Fodor still stated he would not accept the transfer.  (*Id*.).

Thereafter, Mr. Babb talked with Mr. Serna regarding Mr. Fodor's refusal to transfer to the Allanton yard as a Welder.  (Babb Aff. ¶ 11; Serna Aff. ¶ 5).  As a result, Mr. Serna approved a transfer to Allanton where Mr. Fodor could continue to work as a Machinist.  (Babb Aff. ¶ 11; Serna Aff. ¶ 5).  On August 20, 2010, Mr. Babb talked to Mr. Fodor again and informed him that he would be transferred to the Machinist Craft at the Allanton yard.  (Pl. Dep. at 124; Babb Aff. ¶ 11).  However, Mr. Fodor stated that he would not accept the Machinist position at the Allanton yard either.[6]  (Pl. Dep. at 126-27).  Mr. Babb instructed Mr. Fodor to report to work at the Allanton yard.  (Babb Aff. ¶ 11).  Mr. Fodor still refused.[7]  (*Id*.).

Mr. Fodor testified at his deposition that he suffered injuries as a result of a motorcycle accident at the end of 2003.  (Pl. Dep. at 15).  Mr. Fodor believes that he is disabled because of the surgeries he underwent following the accident.  (*Id*. at 30).  Specifically, Mr. Fodor states that the surgeries were necessary for both of his legs

---

[6]Mr. Fodor testified at his deposition that he did not want to accept an outside machinist position because it was outdoors and because of his "physical condition."  (Pl. Dep. at 125-26).  However, Mr. Babb does not recall Mr. Fodor making any distinction about whether he was willing to perform an outside versus inside machinist position.  (Babb. Aff. ¶ 11 n.1).  Mr. Fodor's conditional offer of employment stated that he would be a first class machinist and did not promise him an inside machinist position.  (Pl. Dep. Ex. 20).

[7]Mr. Fodor never reported to work at the Allanton yard.  (Babb Aff. ¶ 12).  Mr. Fodor simply stopped reporting to work and did not call in.  Therefore, Eastern ended Mr. Fodor's employment because he did not show up for work or call in for three consecutive days, which constitutes termination of employment per Eastern's policy. (Babb Aff. ¶ 12 Ex. A).  Mr. Fodor alleges that Mr. Serna fired him.  (Pl. Dep. at 130-31).  Mr. Fodor admits that he had no conversations with Mr. Serna, but instead alleges that Mr. Long told Mr. Fodor that Mr. Serna said he was fired.  (Pl. Dep. at 131-32).  Mr. Fodor relies on inadmissible double hearsay to support his allegation.

and his "entire body" because of "internal injuries."[8]   (*Id*. at 30-31).   Mr. Fodor admits that his surgeries were approximately 10 years ago and that no medical doctor has specifically diagnosed him with a disability.[9]   (*Id*.).   Mr. Fodor admits that after his recovery from the 2003 motorcycle accident, he did not see a doctor for his alleged disability until January of 2013, long after this action was first filed.[10]   (*Id*. at 36-37).

Mr. Fodor admits that after he recovered from his motorcycle accident around May of 2004, he was released to return to work at Waverly Iron, where he was employed as a Welder.   (Pl. Dep. at 39-40).   Mr. Fodor admits that there was no other period of time where he was unable to work or took a leave of absence from work because of his alleged disability.   (*Id*., pp. 40-41).

Although Mr. Fodor alleged in his second amended complaint that he suffered from a disability since his motorcycle accident, he admits that when he applied for a

---

[8]Specifically, Mr. Fodor testified that his left leg is shorter than his right leg and has a plate with screws in it and that he has spasms in his right leg.   (Pl. Dep. at 31-32).   Mr. Fodor admits that he has special shoes that keep his hip bones aligned and that he limps "without the shoes."   (*Id*.). Mr. Fodor also admits that although he has used a cane, he never used one while working at Eastern. (*Id*. at 34).   Mr. Fodor also alleges a spinal cord injury as a result of his accident, but admits that he does not know what kind of injury because "I'm not a doctor."   Mr. Fodor denied any spinal injury when he applied to QSI, a previous employer.   (*Id*. at 33-34, 69-71).

[9]Mr. Fodor testified at his deposition that his alleged disability limits his ability to:  bend over, participate in sports, drive his motorbike, stand, climb a ladder, run, walk long distances, and sit.   (Pl. Dep. at 41, 43).   Mr. Fodor admits that he can make himself breakfast, feed his dogs, clean his house, do laundry, drive a car, shop for food, and care for his grandchild.   (*Id*. at 50-51).   As for any alleged mental disability, Mr. Fodor admits that he did not start taking any depression medication until he "lost his job and I have this case with Eastern;" and that he first obtained depression medication in January of 2013.   (*Id*. at 33).

[10]Mr. Fodor visited Faith Health Clinic in January of 2013, only after his application for social security disability benefits was denied at the end of 2012.   (Pl. Dep. at 55).

job with QSI in March of 2006, he stated on a physical examination form that he had no low back pain, no head or spinal injuries, and no permanent defect from illness or surgery. (Pl. Dep. at 69-71, Ex. 11).

Mr. Fodor admits that when he applied for a job with Eastern in 2007 and again in 2008, he did not request any reasonable accommodation for his alleged disability.[11] (Pl. Dep. at pp. 91-92). Mr. Fodor further admits that, although he alleges performing the welding job during his first stint of employment was difficult, he did not complain about performing any of the tasks. (*Id*. at 92, 94). Mr. Fodor never provided any doctor's notes to Eastern regarding tasks he could not perform. (*Id*. at 199).

Mr. Fodor admits that he attempted to apply for disability benefits through the Social Security Administration (SSA) in October of 2012. (Pl. Dep. at 29). Mr. Fodor did not take any prescription medications for his alleged disability until January of 2013, shortly after his application for disability benefits was denied by the SSA at the end of 2012. (*Id*. at 36, 53).

Although Mr. Fodor asserted that he is now completely unable to work due to his alleged disability, he admits that his job subsequent to Eastern, where he worked as a machinist, ended due to lack of work not because of his alleged disability, and that he was looking for a job, while receiving unemployment benefits, from November of 2011 through October of 2012, when he then sought disability benefits

---

[11]During the second day of his deposition, Mr. Fodor alleged that he told Mr. Long he could not perform certain functions of the welding duties. (Pl. Dep. at 191-92, 196-97). Mr. Fodor stated that Mr. Long would allow him to stand or sit when needed, and that other people performed the tasks he could not complete. (*Id*.). Mr. Fodor then stated, inconsistently, that Mr. Long would sometimes force him to perform duties he did not feel he could safely perform. (*Id*. at 196-97). Mr. Fodor admits that he did not complain about Mr. Long allegedly "forcing" him to weld. (*Id*. at 191-92, 196-98).

from the SSA. (Pl. Dep. at 44-46). Mr. Fodor admits that if he had secured a job, he would not have applied for disability benefits, and further admits that he continued to search for a job while his application for social security benefits was pending. (Pl. Dep. at 49, 61-62).

Mr. Fodor never made any complaints about national original or disability discrimination during his employment at Eastern. (Babb Aff. ¶ 14; Serna Aff. ¶ 8). Instead, Mr. Fodor complained about pranks without stating a belief that the pranks were a result of any protected status. (*Id.*). Specifically, Mr. Fodor complained that someone put grease from the machines on his lunch cooler and drinking bottle. (Pl. Dep. at 156; Babb Aff. ¶ 14; Serna Aff. ¶ 8). Mr. Fodor testified that he believed the grease was smeared on his property because his co-workers "didn't want me to be their boss." (Pl. Dep. at 167). Mr. Fodor also alleges that someone damaged a microwave and coffee machine that he brought into work with him.[12] (*Id.* at 156).

After Mr. Fodor's complaints about the pranks, on two occasions Mr. Long and Mr. Serna gathered all of the workers at the Machine Shop together and informed them that Eastern would not tolerate any such horseplay at the yard and that violations would be dealt with swiftly, including termination.[13] (Pl. Dep. at 162; Babb Aff. ¶ 15; Serna Aff. ¶ 9). After the last such gathering and warning of the

---

[12]Mr. Fodor alleged at his deposition, for the first time, that there was "physical harassment" where other workers "bumped" into him. (Pl. Dep. at 172). Mr. Fodor believes this was based on his national original because "[j]ust the hate, the hatred. There's no other reason – because I was Hungarian." (*Id.*). Interestingly, Mr. Fodor states that the person whom he alleged did most of the harassing, Joe Rodgers, was someone that he got along with during the first part of his second stint of employment with Eastern. (Pl. Dep. at 172).

[13]When Mr. Fodor complained about the pranks, he did not identify who was responsible for the behavior. (Babb Aff. ¶ 15, Serna Aff. ¶ 9).

employees, Mr. Fodor never made any further complaints about his cooler or any other incidents.  (Pl. Dep. at 163; Babb Aff. ¶ 15; Serna Aff. ¶ 9).

Mr. Fodor alleges that Mr. Long remarked that he (Mr. Fodor) could not lead Americans because he wasn't American.  (Pl. Dep. at 164-65).  Mr. Fodor admits, however, that he never complained about the alleged remark, and even stated, "I didn't think it was that serious level to file a complaint."  (*Id*. at 165: 6-8).  Mr. Fodor admits that he would make "crazy American" remarks while at Eastern.  (Pl. Dep. at 164).

Mr. Fodor alleges that American-born employees were treated better than he was treated.  (Pl. Dep. at 178).  When asked in what way, however, Mr. Fodor stated that "they hired people who was someone's cousin or sibling."  (*Id*. at 179).  Mr. Fodor also stated that some employees got special treatment because they provided Mr. Long with drugs, which Mr. Fodor admits would not be based on his (Fodor's) national origin.  (*Id*. at 179-80).  Mr. Fodor stated that Mr. Long "ran the shop based on who was his friend or family or who did a favor, and that's why he used favoritism, who got what, who got this, who got that, and this is how he ran the shop."  (*Id*. at 211).

With regard to alleged harassment based on his alleged disability, Mr. Fodor testified at his deposition that Joe Rodgers, a co-worker, and other unidentified employees made fun of his limping.  (Pl. Dep. at 184).  Mr. Fodor admits, however, that he did not complain about the alleged harassment because "I'm not a whining

little baby.  I don't complain about everything."[14]  (*Id*. at 184-85).  Mr. Fodor also stated that, "I didn't take those things that seriously."  (*Id*. at 185).

Mr. Fodor testified at his deposition that he does not believe Eastern transferred him based on his alleged disability, and that he "does not know" that Eastern would have denied him the supervisor position because of his alleged disability, stating, "I don't know what they base their decisions on."  (Pl. Dep. at 194-95).  Mr. Fodor admits that he does not know whether his employment with Eastern ended because of his alleged disability.  (Pl. Dep. at 195).

With regard to the end of his employment, Mr. Fodor admits that he believes he lost his job because of what he knew about "crimes" Eastern committed against its employees and that such "knowledge" has nothing to do with his national origin or alleged disability.  (Pl. Dep. at 210).

---

[14]Despite this admission, Mr. Fodor, conveniently, toward the end of the second day of his deposition, stated that he complained about the teasing to an unnamed supervisor in a different department, but that he was "just telling him what was going on," and that Mr. Fodor did not expect the unidentified supervisor to do anything about his complaint.  (Pl. Dep. at 202-03, 206-07).  Mr. Fodor also alleges that he told the unidentified supervisor that he had an accident and that his legs were hurting so he could not work outside.  (Pl. Dep. at 190).  At no point during this fairly protracted matter has Mr. Fodor ever mentioned a complaint to such a supervisor.  Such an individual was not listed as a witness on Mr. Fodor's Rule 26 disclosure, *see* Ex. 8, nor in Mr. Fodor's Answers to Interrogatories when asked to identify individuals with knowledge of the allegations in the complaint, *see* Ex. 9.  However, even if Mr. Fodor could identify the supervisor, mentioning a 10-year-old motorcycle accident and that one's legs are hurting does not put a company on notice of an actual disability.

Eastern Is Entitled To Summary Judgment On Mr. Fodor's Disparate Treatment
Claims

      A.     Burden of Proof Applicable to Mr. Fodor's Disability and National
               Origin Disparate Treatment Claims

When a plaintiff alleges disparate treatment under the ADA and/or Title VII,
liability depends on whether the protected trait actually motivated the employer's
decision. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct.
2097, 147 L. Ed. 2d 105 (2000) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604,
610, 113 s. Ct. 1701, 123 L. Ed. 2d 338 (1993)).  In other words, plaintiff's alleged
disability or national origin must have "actually played a role in Defendant's
decision-making process and had a determinative influence on the outcome." *Id.*

Disparate treatment claims under the ADA and Title VII may be proved
through direct evidence or circumstantial evidence.  Direct evidence is "evidence
which, if believed, would prove the existence of a fact [in issue] *without inference or
presumption*." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)
(brackets in original) (quotation omitted).  So long as the action is not made in the
context of terminating an employee nor specifically addresses the decision making
process, it is not direct evidence.  *See Tran v. Boeing Co.*, 190 F. App'x 929, 932
(11th Cir. 2006).  Plaintiff has presented no direct evidence that either his alleged
disability or national origin played any role in Eastern's decision making process.[15]

---

    [15]Although Mr. Fodor alleged that his supervisor, John Long, stated that he (Fodor) was "not
a good candidate because the people who work in the shop with me do not listen to me because I'm
not American and I do have an accent" (Pl. Dep. 115: 1-3), such a statement is not direct evidence
of discrimination based on Mr. Fodor's national origin.  Mr. Long was not the decision maker with
regard to the Machinist Supervisor position – Mr. Serna was the decision maker, and Mr. Fodor has
not attributed any alleged remarks (based on either an alleged disability or national origin) to Mr.
Serna. *See Diaz v. AIG Mktg. Inc.*, 396 F. App'x 664, 666 n.2 (11th Cir. 2010) ("[R]emarks by non-

Where, as here, there is no direct evidence of intentional national origin or disability discrimination, plaintiff must utilize the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under the *McDonnell Douglas* analysis, the plaintiff carries the initial burden of establishing a *prima facie* case of national origin or disability discrimination.  *See id.* at 802.  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment decision.  *See id.*  Once the defendant has proffered a legitimate reason for the applicable adverse employment action, the presumption against the defendant is rebutted, and the plaintiff must come forward with evidence that the reasons are pretextual.  *Id.*

<blockquote>

B.  Mr. Fodor Cannot Establish A *Prima Facie* Case Of National Origin Or Disability Discrimination Based On Eastern's Alleged Failure To Promote

i.  National Origin Failure-To-Promote *Prima Facie* Case

</blockquote>

Under Title VII, "[i]n the failure-to-promote context, the *prima facie* case consists of showing these elements:  (1) that the plaintiff belongs to a protected class; (2) that [ ]he applied for and was qualified for a promotion; (3) that [ ]he was rejected despite h[is] qualifications; and (4) that other equally or less-qualified employees outside h[is] class were promoted."  *Bryant v. Dougherty Cnty. Sch. Sys.*, 382 F.

---

decision makers or remarks unrelated to the decision making process itself are not direct evidence of discrimination"); *Williamson v. Advnetist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) ("To qualify as direct evidence of discrimination, we require that a biased statement by a decision-maker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision").  Further, with regard to his transfer and the end of his employment, Mr. Fodor does not point to any statement by a decision maker that would indicate an animus toward Hungarians or individuals with disabilities.

App'x 914, 917 (11th Cir. 2010) (citation omitted).  In addition, a critical element of a failure-to-promote claim is that the position remains open after an applicant is rejected.  *See Jefferson v. Burger King Corp.*, 505 F. App'x 830, 833, 835 (11th Cir. 2013) (affirming grant of summary judgment because the plaintiff failed to establish that any position he applied for remained open after the employer rejected his applications).

Eastern asserts that Mr. Fodor cannot establish a *prima facie* case of failure to promote because the undisputed facts demonstrate that the Machinist Supervisor position was not "open" and available to be filled, due to the economic downturn from the Gulf Oil Spill.  By failing to respond to Eastern's motion, Mr. Fodor has offered no evidence to overcome Eastern's charge that he is unable to establish a *prima facie* case.  Mr. Fodor is not permitted to stand on the allegations of his complaint in order to establish all the elements of a *prima facie* case.  *See Celotex*, 477 U.S. at 324 (Rule 56 "requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'").  Further, as Mr. Fodor's own second amended complaint alleges, no one filled the Machinist Supervisor position that had been placed on hold.  (Doc. 89, p. 6 ¶ 6).  Mr. Fodor admits that Bob Babb told him the position was on hold.  (Doc. 138 ¶ 9; Doc. 139, Pl. Dep. at 123: 18-21).  Eastern's evidence confirms that the position was on hold.  (Doc. 138 ¶ 7).  Mr. Fodor offers no admissible evidence suggesting that his national origin played a role in the decision to place a hold on the position without filling it.  The summary judgment record taken as a whole could not lead a rational

trier of fact to find that Mr. Fodor established a *prima facie* case of national original discrimination.

      ii.    Disability Failure-To-Promote *Prima Facie* Case

To prove a *prima facie* case of employment discrimination under the ADA, the plaintiff must show that "(1) [ ]he has a disability; (2) [ ]he is a qualified individual; and (3) [ ]he was subjected to unlawful discrimination because of h[is] disability." *Diaz v. Transatlantic Bank*, 367 F. App'x 93, 98 (11th Cir. 2010) (*citing Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996). Although the Eleventh Circuit has not specifically outlined the requirements for a *prima facie* case of failure to promote under the ADA, other circuits have found that the failure-to-promote framework under Title VII offers guidance for such ADA cases. *See Culbertson v. Holder*, No. 12-2734-EFM-DJW, 2013 WL 3517141, at *4 (D. Kan. July 11, 2013). As with his national origin claim, Mr. Fodor would have to show that he applied for an open position and that Eastern refused the promotion under circumstances which give rise to an inference that the decision was based on his disability. As discussed above, Mr. Fodor cannot establish a *prima facie* case of failure to promote because there is no dispute that the Machinist Supervisor position was not "open" and available to be filled, due to the economic downturn from the Gulf Oil Spill. Eastern is entitled to summary judgment on Mr. Fodor's failure-to-promote claim asserted under the ADA.

Even assuming *arguendo* that the Machinist Supervisor position had been open, Mr. Fodor's disability claim fails because no evidence at all supports a finding, or inference, of disability as defined by the ADA. The ADA applies to individuals who (1) have a physical or mental impairment that substantially limits one or more major life activities; (2) have a record of a physical or mental impairment that

substantially limits a major life activity; or (3) has an actual or perceived impairment that is not both transitory and minor.  42 U.S.C. § 12102(1).  Only the first and third methods of establishing disability are at issue in this case.

Mr. Fodor cannot establish he had a physical impairment that substantially limited one or more major life activities at the time he applied for the Machinist Supervisor position.  Mr. Fodor was involved in a motorcycle accident in 2003 which, he alleges, limits his ability to bend over, participate in sports, drive his motorbike, stand, climb a ladder, run, walk long distances, and sit.  (Doc. 138 ¶ 11 n.10).  Even if Mr. Fodor had any evidence to suggest he was impaired in some way, impairment alone is insufficient.  *Carper v. TWC Servs., Inc.*, 820 F. Supp. 2d 1339, 1352 (S.D. Fla. 2011) ("Thus, while these alleged symptoms can be expected to have an adverse impact on Plaintiff's life, there is no evidence that they have limited him in any major activity of his life." (*citing Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (affirming summary judgment against ADA plaintiff who suffered from seizures, diabetes, migraines, and depression that adversely affected the plaintiff's life, but did not limit her in a major life activity))).  Mr. Fodor's own testimony, outlined above, demonstrates that he is not substantially limited by any impairment he may have.

For example, after Mr. Fodor recovered from the motorcycle accident around May of 2004, he was released to return to work at Waverly Iron, where he was employed as a Welder.  (Doc. 138 ¶ 12).  Mr. Fodor admitted there was no period of time where he was unable to work or took a leave of absence from work because of his alleged disability.  (*Id.*).  Mr. Fodor also admitted that when he applied for a job with QSI in March of 2006, he stated on a physical examination form that he had no low back pain, no head or spinal injuries, and no permanent defect from illness or

injury.  (Doc. 138 ¶ 13).  Mr. Fodor admits that when he applied for a job with Eastern in 2007 and 2008, he did not request any reasonable accommodation for his alleged disability, and in fact, Mr. Fodor stated in his 2008 employment application that he was able to perform the essential functions of the job to which he was applying.  (Doc. 139, Pl. Dep. at 91-92, Ex. 13).

Further, although Mr. Fodor alleges he is now completely unable to work due to his alleged disability, he admits that his job subsequent to Eastern, where he worked as a Machinist, ended due to lack of work, not because of his alleged disability.  (Doc. 138 ¶ 16).  Mr. Fodor also admits he was looking for a job, while receiving unemployment benefits, from November of 2011 through October of 2012, when he then sought disability benefits from the SSA.  (*Id*.).  Mr. Fodor admits that if he had secured a job, he would not have applied for disability benefits, and that, in fact, he continued to search for a job while his application for social security benefits was pending.  (*Id*.).

In addition, Mr. Fodor admits that no doctor  has diagnosed him as suffering from any substantially limiting condition.  (Doc. 139, Pl. Dep. at 30: 14-18); *see Mobley v. Bd. of Regents of the Univ. Sys. of Ga.*, 26 F. Supp. 2d 1374, 1375 (S.D. Ga. 1996) (finding that "Plaintiff's claim that her asthma constituted a disability was rejected because of a total lack of medical evidence that her asthma substantially limits one or more of her major life activities," as the plaintiff failed to submit an affidavit or the testimony of a treating physician or any other medical evidence of her alleged disability).

The undisputed evidence is that Mr. Fodor was not substantially limited in any major life activity and could perform all the necessary functions of life and work

during and after his employment with Eastern. *See Carper*, 820 F. Supp. 2d at 1352 ("Plaintiff's own conduct and deposition testimony belie the claim that he is disabled as that term is defined in the Act. . . . As demonstrated by his own conduct and sworn testimony, no rational trier of fact could find Plaintiff to be substantially limited in any major life function:); *see also Jackson v. Meadwestvaco Coated Bd., Inc.*, No. 3:09cv695-MEF, 2010 WL 4000614, at *9 (M.D. Ala. Sept. 22, 2010) ("Plaintiff's submissions to the Court offer very little to establish any of these elements [of disability]. Plaintiff's scant testimony about 'shortness of breath' and 'tightness in his chest' does not establish that the severity of these conditions is such that it 'substantially limits one or more of the major life activities.'"). Because Mr. Fodor has provided no evidence of an actual disability, summary judgment in favor of Eastern is appropriate on all of his claims based on actual disability.

Mr. Fodor also cannot establish that any decision maker regarded him as disabled. It is the views of the decision makers, not co-workers or other employees, that are relevant for "regarded as" disparate treatment claims. *See Young v. United Postal Serv., Inc.*, 707 F.3d 437, 444 (4th Cir. 2013) ("[W]here an employee relies on a 'regarded as' disabled theory, we focus on the reactions and perceptions of the employer's decision makers. . . ." (citation omitted)); *see also Deas v. River West, L.P.*, 152 F.3d 471, 476 n.9 (5th Cir. 1998). Marvin Serna was the sole decision maker regarding the freezing of the Machinist Supervisor position and the decision to transfer Mr. Fodor to the Allanton yard. There is no evidence that Mr. Serna regarded Mr. Fodor as disabled or that any perceived disability played a role in his decision making process.

Eastern is entitled to summary judgment on all of Mr. Fodor's disparate treatment disability claims as he has failed to show that he was disabled either with an actual disability that substantially limited a major life activity, that Eastern's decision makers regarded him as disabled, or that there was any intent to subject him to disability discrimination.

C.   Mr. Fodor Cannot Establish A *Prima Facie* Case For Discriminatory Transfer Or Termination Under Either A Theory Of National Origin Or Disability Discrimination

"To establish job discrimination in transfers [and terminations] . . ., a Title VII plaintiff relying upon circumstantial evidence first must make a *prima facie* case of discrimination by showing that he . . . was treated differently than were similarly situated employees [outside his protected class] with respect to transfers" and terminations. *Alexander v. Vesta Ins. Group, Inc.*, 147 F. Supp. 2d 1223, 1235 (N.D. Ala. 2001) (transfers); *see also Smith v. CH2M Hill, Inc.*, 521 F. App'x 773, 775 (11th Cir. 2013) (terminations).

Eastern asserts that Mr. Fodor cannot establish a *prima facie* case of discriminatory transfer, because there is no dispute that the downturn in demand due to the Gulf Oil Spill was the sole motivation behind Eastern's decision to transfer Mr. Fodor, and similarly situated employees outside his protected class, to a location where work remained.  (Doc. 138 ¶¶ 4, 7-8).  Because he failed to respond to Eastern's motion, Mr. Fodor has offered no evidence to overcome Eastern's charge that he is unable to establish a *prima facie* case.  Mr. Fodor is not permitted to stand on the allegations of his complaint in order to establish all the elements of a *prima facie* case.  *See Celotex*, 477 U.S. at 324.

There is no dispute that nine employees were transferred to the Allanton yard before Eastern instructed Mr. Fodor to transfer to the Allanton yard. (Doc. 138 ¶ 8). None of the predecessors were foreign born; all were Caucasian Americans. (*Id*.). Mr. Fodor has acknowledged that several employees in his craft were transferred to the Allanton yard before he was asked to transfer. (Doc. 139, Pl. Dep. at 113: 10-21). Mr. Fodor cannot establish that similarly situated employees outside his protected class were treated differently.

The same is true for any claim that Mr. Fodor was "terminated" due to his national origin. Even if Mr. Fodor's allegations are deemed true (though Eastern denies that it involuntarily terminated Mr. Fodor),[16] Mr. Fodor cannot establish that any American-born employee refused a transfer and was able to continue working at the Nelson yard.

Inasmuch as Mr. Fodor's second amended complaint (doc. 89) can be read to allege that the proposed transfer to the Allanton yard was done to discriminate against Mr. Fodor on the basis of his supposed disability, Mr. Fodor admitted in his deposition that he did not believe the proposed transfer was based on his alleged disability. (Doc. 139, Pl. Dep. at 176: 25 - 177: 3 (attributing the transfer decision to national original discrimination); Doc. 138 ¶ 22). Mr. Fodor's own admission (in addition to his failure to establish he was disabled or regarded as disabled) precludes any claim for a transfer based on disability discrimination.

---

[16] Eastern's undisputed policy deems three consecutive no call, no show days a voluntary resignation. (Doc. 139, Serna Aff. ¶ 6; Doc. 138 ¶ 10 n.8). There is no dispute that Mr. Fodor refused to appear at the Allanton yard. (*Id*.). Thus, Mr. Fodor cannot show that his ultimate termination was pretextual.

Eastern is entitled to summary judgment on all of his discriminatory transfer and termination claims.

> ### D.     Mr. Fodor Cannot Rebut Eastern's Legitimate, Non-Discriminatory Reasons For The Failure To Promote, Eastern's Transfer Decision, Or Mr. Fodor's Termination For No Call, No Show

Even if Mr. Fodor could make out a *prima facie* case for national origin or disability discrimination in the failure to promote, attempted transfer, or termination for not appearing for work, Mr. Fodor's claims would still fail because he has failed to offer evidence of pretext.  Eastern's legitimate, nondiscriminatory reason for not promoting Mr. Fodor is that the Gulf Oil Spill caused a downturn in business that forced it to place a hold on the Machinist Supervisor position.  (Doc. 138 ¶ 7).  The downturn also shifted Eastern's staffing needs at its yards, causing Eastern to transfer Mr. Fodor to the Allanton yard where work remained.  (*Id*. ¶ 8).  Eastern then terminated Mr. Fodor for refusing to transfer.  (*Id*. ¶ 10 n.8).  Whether Mr. Fodor refused to transfer to the Allanton yard and was involuntarily terminated (as Mr. Fodor alleges) or voluntarily resigned as a result of three days of no call/no show (as Eastern states), the end result is that Mr. Fodor's employment ended because he refused to transfer to the Allanton yard.  In failing to respond to Eastern's motion, Mr. Fodor has clearly failed to offer "evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Corbitt v. Home Depot U.S.A., Inc.*, 573 F.3d 1223, 1248 (11th Cir. 2009); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (holding that to show pretext, plaintiff must offer evidence showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of

credence."). "Mere speculation of a discriminatory motive is insufficient." *Turner v. Inzer*, No. 4:11cv567-RS-WCS, 2010 WL 4458341, at *5 (N.D. Fla. Sept. 26, 2012) (*citing Edwards v. Acadia Realty Trust, Inc.*, 141 F. Supp. 2d 1340, 1346-47 (M.D. Fla. 2001)); *see also Brown v. Progress Energy*, 364 F. App'x 556, 558 (11th Cir. 2010) ("We have reviewed the entire record and conclude that Brown's . . . claim is based on his subjective perception and speculation rather than on specific facts from which a reasonable jury could find that he was subjected to [discrimination] because of his race."). Eastern is entitled to summary judgment on all of Mr. Fodor's disparate treatment discrimination claims.

Application of Summary Judgment Standard to Mr. Fodor's Harassment Claims

Mr. Fodor also claims Eastern created a hostile work environment based on his national origin and disability. A plaintiff alleging hostile work environment discrimination  must prove that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

To establish a *prima facie* case of hostile work environment, a plaintiff must prove:  (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is

responsible for such environment under either a theory of vicarious or a theory of direct liability.  *Miller*, 277 F.3d at 1275.  Even if the plaintiff makes this *prima facie* showing, the employer has an affirmative defense if the plaintiff unreasonably failed to utilize the employer's harassment reporting process.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).  Eastern asserts that Mr. Fodor cannot establish a *prima facie* case of harassment, because there is no dispute that the alleged conduct was neither severe nor pervasive.  Eastern further asserts that the undisputed evidence in the summary judgment record establishes that Mr. Fodor unreasonably failed to invoke Eastern's harassment reporting procedures.

A.    Alleged Pranks

Mr. Fodor's allegations regarding the pranks related to his lunch box, water container, microwave and coffee maker do not show the existence of a genuine factual dispute about whether he was subjected to discriminatory harassment, because Mr. Fodor's allegations are based entirely on Mr. Fodor's speculation or belief without any basis in ascertainable fact.  Mr. Fodor testified at his deposition that the pranks started once he applied for the supervisor position.  (Doc. 139, Pl. Dep. at 166: 18-23).  When asked how that coincidence in timing suggested national origin discrimination, Mr. Fodor speculated, "Just the hate against me.  They do all kinds of hateful things against me."  (*Id*. at 167: 1-4).  Mr. Fodor then explained that they were playing pranks against him and giving him a hard time "because they didn't want me to be their boss," (doc. 138 ¶ 17), a supposed basis devoid of any protected characteristics under the ADA or Title VII.  *See Josendis v. Wall To Wall Residence*

*Repairs Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) ("Unreliable conjecture . . ., presented as a 'belief' without any basis in ascertainable fact, [i]s not the type of admissible evidence required to survive a motion for summary judgment. . . . At the summary judgment stage, such 'evidence,' consisting of one speculative inference heaped upon another, [i]s entirely insufficient." (*citing Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005))). The alleged pranks amounted to run-of-the-mill horseplay, which does not give rise to a claim of hostile work environment. *See Oncale v. Sundowner Offshore Servs, Inc.* 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (holding that "ordinary socializing in the workplace – such as male-on-male horseplay" was insufficient to show discriminatory harassment); *Mitchell v. Pope*, 189 F. App'x 911, 913 (11th Cir. 2006) (finding that alleged harassment was horseplay and not based on a protected characteristic, and therefore affirming summary judgment).

B.     Remarks

Mr. Fodor has not raised a genuine issue of material fact showing that any alleged verbal harassment was either severe or pervasive both subjectively and objectively. Mr. Fodor's allegations indicate that any national origin-based remarks occurred infrequently. (Doc. 139, Pl. Dep. at 154: 13-17 (Mr. Fodor's admission that statements regarding his national origin only occurred "off and on.")).[17] Mr. Fodor's

---

[17]Mr. Fodor testified that his coworkers told him to "go back where [Mr. Fodor] came from." (Doc. 139, Pl. Dep. at 153-54). "Employer liability in a case involving [harassment] by a co-worker exits when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11t Cir. 2000) (citation omitted). Mr. Fodor never mentioned the basis of the harassment in any complaint he made to Eastern, so Eastern was never on notice of any national origin harassment and cannot be liable for the comments Mr. Fodor alleges.

deposition testimony also refers to national origin-based jokes, but Mr. Fodor was not subjectively offended by those jokes; thus, those jokes cannot be counted toward frequency. (*See* Doc. 139, Pl. Dep. at 156: 17-20 ("[T]he everyday jokes that I kept ignoring . . . didn't make me angry.")); *Harris*, 510 U.S. at 21-22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). Further, Mr. Fodor cannot argue that such alleged harassment was unwelcome when he admits that he made "crazy American" comments while at work. (Doc. 139, Pl. Dep. at 164: 13-14).

To determine whether conduct was objectively severe or pervasive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Mr. Fodor's alleged harassment amounts to infrequent, trivial slights and jokes in the workplace, and was not objectively severe. Such conduct does not give rise to an actionable hostile work environment.

For the disability harassment claim, Mr. Fodor testified at his deposition that his supervisor Mr. Long joked about Mr. Fodor's accident, saying "Here comes Frank with the handle bar sticking out of his butt." (Doc. 139, Pl. Dep. at 106: 15-19). It is mere speculation to conclude that this comment was about any disability Mr. Fodor suffered or appeared to suffer, as the comment was based solely on Mr. Fodor's accidentt itself without any reference to any disability. Mr. Fodor also testified that Joe Rodgers, one of his co-workers, and other unnamed co-workers, made fun of his limping and imitated it. (Doc. 139, Pl. Dep. at 183: 18-25; 32:4-5). Mr. Fodor

alleges no particulars regarding the co-workers who imitated his limp and only vaguely described the conduct.  Mr. Fodor admitted that he never complained about the imitations of his limping.  (Doc. 139, Pl. Dep. at 183: 19; Doc. 138 ¶ 21 ("Q:  And you never complained about this, correct?  A:  "I'm not a whining little baby. . . .").) Mr. Fodor's failure to report the teasing indicates that he did not subjectively perceive the conduct as severe or pervasive and, as described below, removes any liability for Eastern because it had no notice of these incidents of harassment.

Eastern is entitled to summary judgment on all of Mr. Fodor's harassment claims, because the undisputed evidence in the summary judgment record establishes that the comments and behavior were not so severe or pervasive to have changed the terms and conditions of Mr. Fodor's employment.

C.     Failure To Adequately Report The Alleged Harassment

Even if harassment occurred, Mr. Fodor failed to adequately report it, so Eastern has a complete affirmative defense under *Faragher* and *Ellerth*.  These cases provide an affirmative defense so long as the employer: (1) exercised reasonable care to prevent and correct harassment and (2) the plaintiff unreasonably failed to take advantage of preventive or corrective action opportunities.  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

Eastern has a thorough anti-harassment policy and reporting procedure, which Mr. Fodor acknowledged receiving.  (Doc. 139, Pl. Dep. at 111: 23 - 112: 16). Despite Mr. Fodor's awareness of the policy and procedure, Mr. Fodor unreasonably failed to take advantage of them.  Mr. Fodor admits that he never complained to Eastern about any of the issues he now raises in this litigation.  (Doc. 139, Pl. Dep. at 164-65 (Mr. Fodor's admission that he failed to complain about Mr. Long's alleged

comment about his ability to lead Americans); Pl. Dep. at 163: 9-13 (Mr. Fodor's admission that he did not mention that the pranks were based on his national origin); Pl. Dep. at 183: 19 - 184: 7 (Mr. Fodor's admission that he never complained about imitations of his limp).

The only instances of complaining about co-worker behavior concerned the pranks with Mr. Fodor's lunch box, water cooler, coffee maker and microwave, but Mr. Fodor did not tell Eastern that these pranks were based on any protected characteristics.  (Doc. 139, Pl. Dep. at 163: 9-13; Doc. 138 ¶ 17 (stating that no protected classes were mentioned when Mr. Fodor complained about pranks).  When Mr. Fodor did make this generalized complaint, John Long and Marvin Serna took prompt action to inform all employees that horseplay was not permitted and to quit playing pranks on Mr. Fodor.  (Doc. 138 ¶ 18).  Mr. Fodor's failrue to make any further complaints entitled Eastern to assume its intervention was successful.

Mr. Fodor's alleged complaint to an unnamed supervisor does not create a genuine issue of material fact precluding summary judgment.  First, a court may reject a plaintiff's claimed report of harassment to unidentified supervisors when offered in opposition to summary judgment.  *E.g. Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 881 (S.D. Tex. 2010); *Motley v. Tractor Supply Co.*, 32 F. Supp. 2d 1026, 1043-44 (S.D. Ind. 1998) (refusing to credit complaints to unspecified supervisors).  Second, because Mr. Fodor refused to give any details regarding this supervisor, his story cannot be corroborated.  As discussed above, Mr. Fodor's allegation that he complained to an unnamed supervisor first surfaced on the second day of his deposition when he testified that he talked about disability-related treatment to an unnamed supervisor in a different department days before his termination.  At no

other point during the two-year pendency of this case has Mr. Fodor ever mentioned a complaint to such a supervisor.  Mr. Fodor did not list this person as a witness on his Rule 26 disclosure, and did not identify this person in his Answers to Interrogatories when asked to identify individuals with knowledge of the allegations in his complaint.  (Doc. 138 ¶ 21 n.15).  Uncorroborated and general allegations advanced by a discrimination plaintiff is insufficient to withstand summary judgment. *See Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion.").  Further, Mr. Fodor allegedly told the supervisor about his motorcycle accident and was "just telling him what was going on" with his co-workers.  (*Id.*).  Mr. Fodor testified that he did not expect the unidentified supervisor to do anything about his complaint.  (*Id.*).  Mr. Fodor's allegation about the unnamed supervisor is insufficient to withstand summary judgment.

Application of Summary Judgment Standard to Mr. Fodor's Retliation Claim

To establish a *prima facie* case of retaliation, a plaintiff must show the following:  (1) he engaged in activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment decision.  *See Little v. United Techs, Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997)  If Mr. Fodor establishes a *prima facie* case, Eastern must proffer a legitimate, non-retaliatory reason for the adverse employment action.  Mr. Fodor bears the ultimate burden of proving by a preponderance of the evidence that Eastern's articulated reasons are a pretext for

prohibited retaliatory conduct.  *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

Eastern asserts that Mr. Fodor cannot establish a *prima facie* case of retaliation, because there is no dispute that Mr. Fodor did not engage in protected activity.  An employee's complaints must clearly put the employer on notice of a violation of the law.  *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999) (no protected activity where plaintiff complained of supervisor's treatment but never stated a belief that it violated Title VII or any other law); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (granting summary judgment and finding that general complaints absent specific allegations of sexual harassment do not constitute protected activity); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that letter to human resources complaining about unfair treatment but not specifically complaining about discrimination is not protected activity).

Mr. Fodor not only failed to put Eastern on clear notice of a violation of Title VII or the ADA, he failed to identify evidence to even to support an inference of such a violation.  Although Mr. Fodor offered conjecture at his deposition that his national origin was somehow connected to the horseplay relating to his lunch box, water cooler, microwave and coffee maker, he only complained about the horseplay without mentioning discrimination.  Mr. Fodor points to no discrete occasion on which he complained about any remarks based on his national origin or disability.  Mr. Fodor's failure to establish that he engaged in protected activity warrants summary judgment in favor of Eastern.

Mr. Fodor also fails to raise a genuine issue of fact with regard to causation. Mr. Fodor must establish that the retaliation was the "but-for" cause of the adverse employment actions he allegedly suffered. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). Mr. Fodor has not raised a genuine issue of fact about whether his complaints caused him to not be promoted to Machinist Supervisor or to be transferred to the Allanton yard, as he has not submitted any admissible evidence of causation.

Further, as discussed previously, Mr. Fodor has not submitted any evidence creating a genuine factual dispute as to whether Eastern's reasons for not promoting him and for transferring him were pretext for retaliation. Eastern has submitted evidence of legitimate, nondiscriminatory, nonretaliatory reasons for its employment decisions affecting Mr. Fodor. The economic downturn after the Gulf Oil Spill caused Eastern to put the Machinist Supervisor position on hold, and also caused Eastern to transfer a number of employees, including Mr. Fodor, to the Allanton yard. Mr. Fodor was ultimately terminated for not transferring. Because Mr. Fodor has not and cannot refute Eastern's legitimate, nondiscriminatory and nonretaliatory reasons for the alleged adverse employment actions Mr. Fodor suffered, Eastern is entitled to summary judgment on Mr. Fodor's retaliation claim.

## CONCLUSION

Eastern has established that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on all claims alleged in Mr. Fodor's second amendment complaint. In light of this court's determination that Eastern is entitled to summary judgment on all claims, Eastern's motion to dismiss for Mr. Fodor's failure to pay the discovery sanction (doc. 133) should be denied as

moot.   Also, because this case has come to an end, the undersigned finds it unproductive and unnecessary to impose an additional monetary sanction against Mr. Fodor for the additional incident of vexatious conduct.   The undersigned does not condone Mr. Fodor's unexplainable, and, on occasion, downright rude, behavior toward counsel and defendant's corporate representative in this case.   Nevertheless, having concluded that none of the claims advanced have any merit, the undersigned also concludes that no worthy end could be gained by subjecting this plaintiff to further sanction.   Eastern's motion for sanctions (doc. 153) will therefore be denied.

Accordingly, it is ORDERED:

Defendant's motion for sanctions (doc. 153) is DENIED.

And, it is respectfully RECOMMENDED:

1.  That defendant's motion for summary judgment (doc. 137) be GRANTED.

2.   That defendant's motion to dismiss (doc. 102) for plaintiff's failure to comply with the court's August 30, 2013 discovery order be DENIED as moot in light of defendant's notice of plaintiff's compliance (doc. 134) and in light of this court's entry of summary judgment in defendant's favor on the merits.

3.  That defendant's motion to dismiss (doc. 133) for plaintiff's failure to obey the discovery order requiring plaintiff to pay a discovery sanction be DENIED as moot in light of this court's entry of summary judgment in defendant's favor on the merits.

4.  That judgment be entered in favor of the defendant and against the plaintiff on all claims.

5.  That the $5,218.89 discovery sanction imposed against plaintiff in favor of defendant be reduced to judgment.

At Pensacola, Florida this 27th day of March, 2014.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).